**UNITED STATES DISTRICT COURT**         **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| THE CADLE COMPANY, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 4:06-CV-203 |
| | § | |
| ANTHONY FRANCIS ORSINI and | § | |
| REBECCA LYNN ORSINI, | § | |
| | § | |
| Appellees. | § | |

### MEMORANDUM AND ORDER

Pending before the court is an appeal of a decision rendered by United States Bankruptcy Judge Brenda T. Rhoades ("Judge Rhoades") addressing the discharge of Appellees Anthony Orsini ("Anthony") and Rebecca Orsini's ("Rebecca") (collectively, "the Orsinis") debt obligations to The Cadle Company ("Cadle") under 11 U.S.C. §§ 523(a)(2)(B), 727(a)(3), and 727(a)(5). *See In re Orsini* (03-04049). Having reviewed the opinion, the record, the submissions of the parties, and the applicable law, the court is of the opinion that the decision of the bankruptcy court should be affirmed.

I.  <u>Background</u>

Rebecca, age 54, received a degree in elementary education from Oklahoma State University, but she has worked as a restaurant manager, stockbroker, manager of investor relations at a publicly traded healthcare company, and trust officer for the Bank of Oklahoma. Rebecca holds both brokerage and real estate licenses. Anthony was awarded a degree in finance from Pennsylvania State University and has worked as a technical manager for a credit reporting agency for several years. Previously, he was employed by a financial services company in a

technical capacity for twelve years.  In 1999, the Orsinis formed Orsini Family, Inc. ("Orsini Family"), for the purpose of owning and operating a small business.  Rebecca owned 51% of the shares and assumed the title of president of Orsini Family, while Anthony owned 49% of the company and served as its vice president and secretary.  Shortly thereafter, the Orsinis, through the new corporation, acquired a high-end gift shop, called Foxglove, and an associated restaurant named Nick's American Grill, which they restyled Foxglove Dining (collectively, "Foxglove"). Rebecca conducted the day-to-day operations of the business enterprise, leaving Anthony with a limited role.

In late 1999, the Orsinis, through Orsini Family, applied to Transamerica Small Business Capital ("Transamerica") for a $300,000.00 loan, to be guaranteed in part by the Small Business Administration ("SBA").  On December 13, 1999, as part of the loan process, Rebecca met with John Rogers ("Rogers"), an employee of Transamerica.  Rebecca answered certain questions posed by Rogers, which he reduced to a one-page document entitled "Personal Financial Statement Dated December 13, 1999" ("the December 1999 statement").  The document also includes additional notations presumably derived from an Experien credit report.  Neither Rebecca nor Anthony signed the December 1999 statement or had the opportunity to review it.  At trial, Rebecca conceded that she provided the information that appears on the document concerning the Orsinis' assets.  The Orsinis do not contend that Rogers misrepresented Rebecca's statements regarding their assets.  In relevant part, the December 1999 statement lists the following assets:

| (i)   | Cash & Marketable Securities | $75.000.00  |
| (ii)  | Retirement Assets            | $260,000.00 |
| (iii) | Real Estate                  | $250,000.00 |
| (iv)  | Autos & Other Personal Assets | $30,000.00 |

The credit report listed Rebecca and Anthony as having Experien Ratings of 727 and 703, respectively.  After evaluating the Orsini Family file, Transamerica sent a Conditional Commitment Letter to the Orsinis, notifying them that Orsini Family had been approved for a $300,000.00 loan, subject to SBA's approval and guarantee of 75% of the loan.  Transamerica also required the Orsinis to infuse a cash injection of $66,000.00 into the business and to reconcile their financial statements.  The letter notified the Orsinis of a "drop dead" date of April 17, 2000, beyond which its commitment would expire.

The Orsinis completed and submitted an SBA Personal Financial Statement on March 17, 2000 ("the March 2000 statement"), which lists the following assets:

| | | |
|------|------------------------------------|-------------|
| (i)   | Cash on Hand and in Banks          | $25,000.00  |
| (ii)  | IRA or Other Retirement Account    | $300,000.00 |
| (iii) | Real Estate                        | $250,000.00 |
| (iv)  | Other Personal Property            | $20,000.00  |
| (v)   | Other Assets                       | $20,000.00  |

Cadle contends that these assets were deceptively inflated.  According to a list contained within Section 5 of the March 2000 statement, the "Other Personal Property" and "Other Assets" categories apparently represented stamps, coins, and jewelry, although some confusion remains in this regard.  At trial, the stamps, coins, and jewelry were treated as "Other Personal Property." Thus, it is unclear what items comprised the "Other Assets" category, but the court notes that the Orsinis listed numerous additional items of personal property on their bankruptcy schedule that were not accounted for on the March 2000 financial statement.

The loan to Orsini Family was consummated on July 21, 2000, well after the original April 17, 2000, deadline.  Rebecca and Anthony personally guaranteed the entirety of the loan.  Despite the Orsinis' efforts and the assistance of the SBA loan, Foxglove failed as a business and closed

3

in February 2002.  The assets secured by the SBA loan were sold at auction in April, and on August 22, 2002, the SBA loan was sold to Cadle.

On October 23, 2002, Orsini Family and the Orsinis, as individuals, filed voluntary petitions under Chapter 7 of the United States Bankruptcy Code.  The Orsinis' bankruptcy schedule listed the following relevant assets:

| | | |
|---|---|---|
| (i) | Homestead | $200,000.00 |
| (ii) | Retirement | $40,542.42 |
| (iii) | Stamps | $125.00 |
| (iv) | Coins | $325.00 |
| (v) | Jewelry | $75.00 |

Cadle pursued examinations of the Orsinis and requested all documents relevant to the Orsinis' financial transactions over the five-year period preceding their bankruptcy.  The Orsinis provided three boxes of documents initially and later provided more in response to specific requests.  Cadle, however, was dissatisfied with what it deemed to be an inadequate record from which to form a clear picture of the Orsinis' financial activities.  On February 14, 2003, Cadle filed an adversary proceeding under 11 U.S.C. §§ 523(a)(2)(B), 727(a)(3), and 727(a)(5), objecting to the discharge of the Orsinis' personal guarantee of the SBA loan.  The Orsinis filed an answer to Cadle's complaint, generally denying the allegations therein.

The trial took place on August 24, 2004, and on March 31, 2006, Judge Rhoades issued a Memorandum Opinion overruling Cadle's objections to discharge.  Cadle filed its Notice of Appeal on April 10, 2006.  On April 20, 2006, it submitted Appellant's Designation of Issues, setting forth numerous questions for review by this court.  Subsequently, Cadle refined its appeal to four issues (further consolidated in its briefing into three), contending that:

(1)     The Bankruptcy Court erred in concluding that Plaintiff failed to meet its burden pursuant to 11 U.S.C. § 523(a)(2)(B) to show that the Debtors obtained their SBA loan by using fraudulently inflated financial statements.

(2)     The Bankruptcy Court erred in concluding that Plaintiff failed to meet its burden pursuant to 11 U.S.C. § 727(a)(3) to show that Debtors failed to maintain recorded information from which Debtors' financial condition and business transactions might be ascertained.

(3)     The Bankruptcy Court erred in concluding that in the event Plaintiff did meet its burden pursuant to § 727(a)(3) that Debtors nonetheless produced sufficient records, under the circumstances of the case, to allow creditors to [understand properly] the Debtors' financial history prior to the bankruptcy filing.

(4)     The Bankruptcy Court erred in concluding that Plaintiff failed to meet its burden pursuant to 11 U.S.C. § 727(a)(5)(A) . . . of showing that Debtors failed to explain loss of assets, because Debtors never provided any explanation for a substantial loss in value of a coin collection and jewelry valued at approximately $9,000.00 in their March 2000 financial statement and only $400.00 on their Bankruptcy Schedules.

II.     <u>Analysis</u>

A.     <u>Jurisdiction and General Standard of Review</u>

This court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(c)(2), which provides that an appeal from the bankruptcy court to the district court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts . . . ." Therefore, "when reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court." *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). In reviewing a decision of the bankruptcy court, Rule 8013 of the Federal Rules of Bankruptcy Procedure requires the court to accept the bankruptcy court's findings of fact unless clearly erroneous and to examine *de novo* the conclusions of law. *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 517 (5th Cir. 2004); *Hurt v. Federal Nat'l Mortgage*

*Assoc. & Home Securitization Trust 1 (Fannie Mae), U.S. Bank (In re Homeowners Mortgage & Equity, Inc.)*, 354 F.3d 372, 375 (5th Cir. 2003); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1307-08 (5th Cir. 1985).   Moreover, a bankruptcy court's findings based on credibility determinations are entitled to significant weight because the bankruptcy judge is "'in a far superior position to gauge [the debtors'] credibility than'" a court that has been provided only with cold transcripts.  *General Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 373-74 (5th Cir. 2005) (quoting *First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 814 (5th Cir. 1992)).

B.    Fraudulently Inflated Financial Statements

First, Cadle contends that the Orsinis' personal guarantees of the SBA loan are not dischargeable in bankruptcy because they obtained the loan after making fraudulently inflated financial statements in both December 1999 and March 2000.  Section 523(a)(2)(B) of the United States Bankruptcy Code, entitled "Exceptions to discharge," states in relevant part:

(a)    A discharge . . . does not discharge an individual debtor from any debt— . . .
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— . . .
(B)    use of a statement in writing—
(i)    that is materially false;
(ii)    respecting the debtor's or an insider's financial condition;
(iii)    on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv)    that the debtor caused to be made or published with intent to deceive . . . .

11 U.S.C. § 523(a)(2)(B); *see also Norris v. First Nat'l Bank in Luling (In re Norris)*, 70 F.3d 27, 29 (5th Cir. 1995).  A plaintiff must establish each of these elements by a preponderance of the

6

evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991). The Orsinis concede that the relevant statements concern their financial condition, but they deny that Cadle has satisfied its burden of proof regarding the other elements.

### 1.    The Writing Requirement

As an initial matter, the Orsinis argue that the December 1999 statement does not constitute a "writing" under § 523(a)(2)(B) because it was not written, signed, or even reviewed by either Rebecca or Anthony. The Orsinis maintain that the court should be guided by *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, a case decided by the United States Court of Appeals for the Tenth Circuit. *See* 125 F.3d 1358 (10th Cir. 1997). In *In re Kaspar*, the debtors made oral representations over the telephone, which the loan representative subsequently entered into a computer database, evidently resulting in a "computer generated form." *Id.* at 1359-60. The Tenth Circuit explained that it "perceive[d] distinct reasons for Congress to have intended § 524(a)(2)(B) to require a document in writing under the entire scheme of the Bankruptcy Code" because:

> giving a statement of financial condition is a solemn part of significant credit transactions; therefore, it is only natural that solemnity be sanctified by a document which the debtor either prepares or sees and adopts. In a world where important decisions relating to the extensions of credit and service will be made upon the contents of a statement relating to financial condition, too much mischief can be done by either party to the transaction were it otherwise. Somewhere in the commercial risk allocation picture, the writing must stand as a bulwark which tends to protect both sides. . . . A written statement of financial condition does not mean an oral statement converted into an electronic format.

*Id.* at 1361-62.

In *Chevy Chase Federal Savings Bank v. Graham (In re Graham)*, the Bankruptcy Court for the Middle District of Florida came to the opposite conclusion, reasoning that "[t]he

requirements of § 523(a)(2)(B) are met if the existence of a written statement was caused to be prepared by the [debtor]." 122 B.R. 447, 451 (Bankr. M.D. Fla. 1990) (citing *Birmingham Trust Nat'l Bank v. Roy (In re Roy)*, 40 B.R. 452, 454 (Bankr. S.D. Fla. 1984)). The court finds the rationale of the Tenth Circuit to be more persuasive. Deeming a document a written statement under § 523(a)(2)(B), in situations where the debtor has not had the opportunity to review the statement prepared by another, would circumvent Congress's determination that oral representations are inadequate to deny discharge under the subsection. *See In re Kaspar*, 125 F.3d at 1360-61.

Cadle further argues that the Orsinis adopted the December 1999 statement as their own because the loan was processed based on the financial statement. As Cadle points out, "[a]s long as the written statement is written, signed, adopted or used by the debtor, the basic precondition concerning the writing requirement to the non-dischargeability complaint under section 523(a)(2)(B) is met." *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001) (citations omitted). Yet, as found by Judge Rhoades, there is no evidence that the Orsinis ever signed or even had an opportunity to review the December 1999 statement. While Transamerica may have used the December 1999 statement in its loan processing, the Orsinis did not submit the document or use it in any way. Cadle's argument that the mere printing of the computer-generated form by Rogers, or any other Transamerica employee, renders the document a writing within the meaning of § 523(a)(2)(B) is not compelling—the mere act of another in pressing a "print" button does not have so profound a transformative effect.

The remaining case law relied upon by Cadle is inapplicable to the circumstances of this case. Cadle overlooks the fact that in *In re Michael*, and the other, similar cases it cites in

support, the debtors concretely manifested their intention to adopt the financial statement in question as their own.  For example, in *In re Michael*, although the financial information was transcribed by another, both debtors physically signed the personal financial statement form.  *Id*. Thus, Cadle cannot satisfy its burden of proof with respect to the December 1999 oral statements made by Rebecca.  *See In re Kaspar*, 125 F.3d at 1362; *see also Blerkson v. Gulevsky (In re Gulevsky)*, 362 F.3d 961, 964 (7th Cir. 2004); *Friendly Fin. Serv.-Eastgate, Inc. v. Dorsey*, No. 07-0001, 2007 WL 628176, at *1-2 (W.D. La. Feb. 22, 2007); *Guerriero v. Kilroy (In re Kilroy)*, 354 B.R. 476, 492 (Bankr. S.D. Tex. 2006); *Norcross v. Ransford (In re Ransford)*, 202 B.R. 1, 6 (Bankr. D. Mass. 1996); *The Conn. Nat'l Bank v. Panaia (In re Panaia)*, 61 B.R. 959, 961 (Bankr. D. Mass. 1986).  Accordingly, the court will follow the bankruptcy court's lead by excluding this financial statement from its analysis.

2.   Materially False

While the March 2000 financial statement indisputably constitutes a written document, the Orsinis contest Cadle's assertion that certain of the representations contained therein are "materially false."  In the Fifth Circuit, "[a] statement is materially false if it '"paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit."'"  *In re Norris*, 70 F.3d at 30 n.10 (quoting *Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir. 1991), overruled on other grounds, *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 259 (5th Cir. 1993) (quoting *Borg Warner Cent. Envtl. Sys., Inc. v. Nance (In re Nance)*, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987))).  "[M]ateriality should be judged by comparing the debtor's actual financial condition with the picture debtor paints of it."  *In re Nance*, 70 B.R. at 321 (citing *First*

9

*Safety Fund Nat'l Bank v. Valley (In re Valley)*, 21 B.R. 674, 680 (Bankr. D. Mass. 1982)).  "[A]

relevant, although not dispositive[,] inquiry is 'whether the lender would have made the loan had

he known the debtor's true situation.'"  *Eagle Rock Dev., LLC v. Freeman (In re Freeman)*, 351

B.R. 398, 401 (Bankr. W.D. La. 2006) (quoting *In re Bogstad*, 779 F.2d 370, 375 (7th Cir.

1985)); *accord In re Jordan*, 927 F.2d at 224.

Judge Rhoades determined that any purported misrepresentations in the March 2000

statement were not material because:  (a) they were relatively minor "in light of the total net worth

of the Orsinis" and (b) Transamerica conditionally approved the loan prior to the creation of the

March 2000 statement.  The court affirms on the first basis, making it unnecessary to reach the

bankruptcy court's alternative holding.  In the instant case, Cadle provided no direct evidence that

Transamerica and the SBA would not have made the loan in the absence of the alleged

misrepresentations.  Rather, Cadle argues that "[m]ateriality is judged by the nature of the writing,

not the specific false information contained in the document."  Thus, Cadle reasons that "[b]ecause

a financial statement is the type of document that a lender would ordinarily consider in making a

decision whether to extend credit, submitting a false statement to the lender corrupts the process"

and satisfies the materiality requirement of § 523(a)(2)(B).  Cadle cites to case law stating that

"[t]he creditor can demonstrate its reliance by proving that the false statement was made to support

an application for credit, and that credit was provided after the statement was received."  *Federal*

*Sav. & Loan Ins. Corp. v. Sutherlin*, 109 B.R. 700, 707 (E.D. La. 1989) (citing *Industrial Bank*

*of Commerce v. Bissell*, 219 F.2d 624, 626 (2d Cir. 1955)).  Cadle's argument, however, is

inconsistent with Fifth Circuit case law—even that which it cites:  a court's inquiry into material

falsity focuses on the severity of the misrepresentations and how those representations relate to the debtor's overall, actual financial status.  *See In re Norris*, 70 F.3d at 30 n.10.

Cadle points to alleged misrepresentations concerning three categories of assets to support its materiality contention:  cash on hand, home equity, and personal property.  Judge Rhoades rejected these arguments, concluding that Cadle presented no evidence of materiality and, in any event, that any misrepresentations of value constituted an insignificant portion of the Orsinis' overall financial picture.

a.    <u>Cash on Hand</u>

First, Cadle argues that the Orsinis did not have $25,000.00 in available cash at the time they completed the March 2000 statement.  The bankruptcy court did not find Cadle's argument concerning the $25,000.00 to be persuasive.  Cadle cites no affirmative evidence of a lesser value but, rather, urges the court to infer that the Orsinis lacked $25,000.00 in cash from the fact that they produced insufficient records.  In response, the Orsinis point to an "Investment Report" from a Fidelity account, which shows account activity from December 1, 1999, through December 31, 1999.  This report reflects an account valued at $63,737.88, exclusive of a related retirement account, and a cash deposit of $28,220.00.  The Orsinis claim that other pertinent statements that were provided to Transamerica during the loan process, covering a period from December 1999 through July 2000, have been misplaced from Cadle's file.  At trial, Rebecca testified that "if I made that statement [regarding the March 2000 report], then at one point in time on [March 17, 2000], we must have had [that] cash on hand in banks or in our Fidelity [account]."  Although additional documentation more proximate to the March 2000 financial statement might have been helpful, the court is not left with a firm conviction that Judge Rhoades erred by giving credence

to the Orsinis' representations and their limited documentary evidence, especially in light of the absence of contrary evidence and the significant weight the court must accord to Judge Rhoades's credibility assessments.

b.     <u>Real Property</u>

Next, Cadle argues that the Orsinis misrepresented the value of their home.  Rebecca estimated that the home was worth $250,000.00 on the March 2000 statement because a comparable home in their neighborhood was listed for sale at that price.  She explained that they listed the home as worth only $200,000.00 on their bankruptcy schedules because of changed circumstances, including the construction of a new dump within sight of the home, the erection of seven billboards on an adjacent property, and additional repairs, landscaping, and painting that needed to be done to the home.  Additionally, the Orsinis relied on the appraisal of Pat Covington, a neighbor who was a real estate broker, for the $200,000.00 appraisal.  Rebecca revealed that the home suffered neglect during the previous years as a result of the Orsinis' overriding efforts to transform Foxglove into a successful business enterprise.  At trial, the Orsinis admitted having lodged an unsuccessful protest to a tax appraisal of $185,000.00 on their home during the same period.  Anthony explained that he believed "market value and tax are two different things."  Judge Rhoades determined that Anthony's "testimony was credible" and was "satisfied with his explanation as to the diminution in the value of the Orsinis' residence."

Cadle has not adduced any evidence undermining the Orsinis' testimony.  "[T]ax values may or may not reflect the current fair market value of a given property; at best, they are some indication of value and do not have high probative value."  *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 1287987, at *9 (Bankr. M.D.N.C. Mar. 14, 2005); *see also Amerada Hess*

12

*Corp. v. Commissioner of Internal Revenue*, 517 F.2d 75, 88 (3d Cir.), *cert. denied*, 423 U.S. 1037 (1975).   Cadle also complains, in passing, that the Orsinis' mortgage increased by $25,000.00 as of their bankruptcy filing from the time of the March 2000 financial statement. Cadle has not, however, met its burden of proving that this increase was fraudulent, or that the Orsinis misrepresented the original amount of the mortgage in the March 2000 statement.   In the absence of contravening evidence, the court defers to Judge Rhoades' credibility assessment and concludes that the Orsinis did not misrepresent the value of their home on the March 2000 statement.

c.   <u>Stamps, Coins, and Jewelry</u>

Next, Cadle contends that the Orsinis' March 2000 assessment of the value of their "Other Personal Property" was false.   The Orsinis claimed that their stamp collection, coins, and jewelry aggregated to a total value of $20,000.00.   They made no attempt to separate the value of each individual category.   The Orsinis did not seek formal appraisal of any of these items; rather, this value constituted a supposedly good faith estimate based on their judgment.   On their bankruptcy schedule, however, the Orsinis valued the stamps as worth $125.00, the coins at $325.00, and the jewelry at $75.00.   At trial, Anthony explained that, at the time of the March 2000 statement, he believed his coin collection to be worth in excess of $1,000.00, based on his recollection of what he had paid and a review of the coins.   Rebecca examined her jewelry to estimate a value for it. She later elucidated at least part of the depreciation in the value of her jewelry by claiming to have lost a pair of earrings worth approximately $500.00.

Shortly before submitting the March 2000 financial statement, Rebecca inherited three boxes of stamps, containing between one and two thousand stamps, from her uncle, who collected

13

them and sold them at auctions and shows.  Rebecca purportedly assumed that, because her uncle

left them to her, they had significant value.  Additionally, she testified at trial that she planned to

exploit the stamps' value by selling them as framed art at Foxglove, a method she discovered

while employed as a marketing representative.  She explained that she retained an employee, John

Keiffer, who was capable of matting and framing the stamps.  At trial, she claimed to have

ascribed an initial value of about $10,000.00 to the stamps in anticipation of selling them in this

manner.  In the end, this plan did not come to fruition.  Cadle attacks Rebecca's testimony by

pointing out that it has been inconsistent over the course of the bankruptcy proceedings, that her

valuation method of the stamps (which would have resulted in a profit range of between $30,000

and $90,000) does not comport with the March 2000 statement, that the stamps were worth

considerably less as raw inventory, and that she listed them as a personal asset, not a business

asset.

There is some tension in Judge Rhoades's findings concerning the stamp collection, coin

collection, and jewelry.  In her discussion of § 523(a)(2)(B), Judge Rhoades stated:

> The value attributed to the stamp and coin collections in the [March 2000
> statement] may have been overstated, but, in terms of materiality, the court finds
> that Cadle has failed to prove that this discrepancy materially affected
> [Transamerica] or SBA's analysis of the Orsinis' financial condition—particularly
> in light of the total net worth of the Orsinis, which exceeded the amount of the
> Loan by 200% without including the value of the stamp and coin collections . . . .

Earlier, in the context of § 727(a)(5), Judge Rhoades found:

> The difference in the values in the [December 1999 statement], the [March 2000
> statement], and the Schedules is attributable to the fact that the values in the
> financial statements were based on the Orsinis' estimate of fair market value, and
> the values in the Schedules were based on the Orsinis' estimate of liquidation value.

Judge Rhoades, however, never determined that the stamp and coin collections were overvalued; she merely assumed the possibility hypothetically.   Thus, there is no actual conflict in the bankruptcy court's rulings on this issue.   Judge Rhoades's findings concerning the Orsinis' credibility are entitled to considerable deference, and Cadle has not provided the court with sufficient reason to conclude that the clearly erroneous standard has been satisfied.   *See In re Acosta*, 406 F.3d at 373-74.

d.   <u>The Bankruptcy Court's Ruling on Materiality</u>

Based on the findings of the bankruptcy court and the record evidence, the court concludes that Cadle has failed to meet its burden of proving that the information provided by the Orsinis in their March 2000 financial statement was materially false.   Cadle has not shown that these statements "'" paint[ed] a substantially untruthful picture"'" of the Orsinis' finances.   *In re Norris*, 70 F.3d at 30 n.10 (quoting *In re Jordan*, 927 F.2d at 224 (quoting *In re Nance*, 70 B.R. at 321)). At most, Cadle has shown that a relatively small portion of the March 2000 statement may have been inaccurate.   Certainly, Rebecca's inconsistent explanations regarding the value of the stamp collection are difficult to reconcile.   Nevertheless, these items account for a minor sum in light of the entirety of the Orsinis' purported financial wherewithal at the time the representations were made.   Thus, Cadle has failed to meet its burden of proof by demonstrating the material falseness of the estimates of value contained within the March 2000 statement.

3.   <u>Reasonable Reliance</u>

Cadle also maintains that the bankruptcy court erred by concluding that Cadle did not meet its burden of proving that Transamerica reasonably relied upon the March 2000 statement.   While

15

acknowledging that it offered no direct evidence of reliance, Cadle argues that Judge Rhoades should have inferred Transamerica's reliance on the March 2000 statement.

"Section 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance itself . . . ." *Field v. Mans*, 516 U.S. 59, 68 (1995).  In the Fifth Circuit, "a bankruptcy court's determination regarding the reasonableness of a creditor's reliance under section 523(a)(2)(B) is factual in nature and therefore insulated by the clearly erroneous standard of review." *In re Coston*, 991 F.2d at 260.  "The reasonableness of a creditor's reliance . . . should be judged in light of the totality of the circumstances." *Id*. at 261.  Proper factors for consideration include, non-exclusively, "whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Id*. (citing *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992), *cert. denied*, 507 U.S. 916 (1993); *First Bank of Colo. Springs v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987)).

In reaching the factual conclusion that Transamerica did not reasonably rely upon the March 2000 statement, Judge Rhoades considered "the lack of any basis for [Transamerica's] reliance upon a lay estimation of a recently inherited stamp collection, and the lack of any inquiry by [Transamerica] regarding the Orsinis' valuations in the [March 2000] statement."  The bankruptcy court apparently believed that a minimal investigation would have uncovered the purported inaccuracies in the March 2000 statement.  The court observes that, on the December 1999 statement, the Experien credit report column indicates a mortgage of $133,000.00 on the

home, thus negating the element of reasonable reliance concerning the $100,000.00 figure supplied by the Orsinis.  On this record, Judge Rhoades's ruling is factually consistent with the evidence, and her finding is not clearly erroneous.  Cadle has not, for example, presented any evidence that "the relevant practice in the industry was to rely solely on the documentation presented by the applicant."  *Young v. National Union Fire Ins. Co. of Pittsburgh, Pa. (In re Young)*, 995 F.2d 547, 549 (5th Cir. 1993).

Cadle attempts to undermine the bankruptcy court's factual determinations by pointing out that the March 2000 statement's form contained a warning that false statements may subject the applicant to federal prosecution.  Cadle also reasons that $20,000.00 in jewelry and collectibles is not such a significant sum as to be unusual and raise a red flag.  Finally, Cadle points out that Transamerica ran a basic credit check.  Though not illogical, these arguments do not squarely address Judge Rhoades's ruling.   The bankruptcy court found that, under the specific circumstances of the case, a reasonable lender would have conducted at least a minimal investigation into the Orsinis' valuations, which Transamerica failed to do.  Cadle has not provided the court with any reason to conclude that Judge Rhoades's view is clearly erroneous. *See In re Coston*, 991 F.2d at 260.

4.    Intent to Deceive

Cadle also challenges the bankruptcy court's findings that the representations contained within the March 2000 financial statement "were all made in good faith and that the Orsinis lacked any intent to deceive."  Cadle agrees that there is no explicit evidence of an intent to deceive, but it argues that the court should infer such intent from the Orsinis' actions.  Alternatively, it urges that the Orsinis' actions were at least reckless.  "A creditor can prove intent to deceive through

direct evidence." *In re Hudgens*, 149 F. App'x 480, 486 (7th Cir. 2005) (citing *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995)).  Alternatively, "[a] creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement." *Western Builders of Amarillo, Inc. v. Morrison (In re Morrison)*, No. 04-1214, ___ B.R. ___, 2007 WL 329154, at *13 (Bankr. W.D. Tex. Feb. 1, 2007) (citing *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 888 (Bankr. N.D. Iowa 2002)).  Because "[a] debtor will rarely admit that he intended to deceive a creditor[,] . . . intent to deceive under § 523(a)(2)(B) can be inferred from the totality of the circumstances surrounding the debtor's acts, including the debtor's knowledge of or reckless disregard for the accuracy of his financial statements." *Consolidated Bank & Trust Co. v. Dalton (In re Dalton)*, 205 F.3d 1332 (Table), No. 99-1330, 2000 WL 191850, at *3 (4th Cir. 2000) (citing *Insurance Co. of N.A. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1119 (3d Cir. 1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994); *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir. 1993) (citations omitted)).  "A bankruptcy court's determination that a debtor did not act with the intent to deceive is a finding of fact" and subject to the clearly erroneous standard of review.  *In re Hudgens*, 149 F. App'x at 486.  "Ultimately . . ., where a debtor testifies as to her subjective intent, the bankruptcy court must make a credibility determination, considering the debtor's testimony, along with other objective circumstantial evidence of the debtor's subjective intent." *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 409 (5th Cir. 2001) (citing *In re Sheridan*, 57 F.3d at 633-34).

Here, the Orsinis appear to have expended little effort to ensure the accuracy of several of the estimated values on their March 2000 financial statement.  At the same time, the court is

18

hesitant to overturn the credibility determination of the bankruptcy judge, who had the opportunity to assess first-hand the testimony of the witnesses. *See In re Miller*, 39 F.3d at 305-06 (upholding bankruptcy court's holding that a debtor lacked the intent to deceive based on its credibility assessment without regard to the objective weakness of the debtor's explanations). Judge Rhoades specifically premised her conclusion upon her personal observation of the Orsinis' testimony at trial. Thus, despite some reservations, the court declines to reject the bankruptcy court's finding that the Orsinis lacked any intent to deceive.

C.    The Orsinis' Record Keeping

In issues two and three, Cadle asserts that Judge Rhoades erred in concluding that Cadle had not shown that the Orsinis failed to maintain or produce adequate records from which their financial condition and business transactions could be ascertained or, alternatively, that the Orsinis had shown that any failure to do so was justified under the circumstances of the case.

Section § 727(a)(3) provides:

(a)    The court shall grant a debtor a discharge, unless— . . .
      (3)    the debtor has concealed, destroyed, mutilated, falsified, or failed
            to keep or preserve any recorded information, including books,
            documents, records and papers, from which the debtor's financial
            condition or business transactions might be ascertained, unless such
            act or failure to act was justified under all of the circumstances of
            the case . . . .

11 U.S.C. § 727(a)(3). "The plaintiff bears the initial burden of proving that the debtor's financial records are inadequate and that this failure prevented the plaintiff from ascertaining the debtor's financial condition." *Chemoil, Inc. v. Pfeifle (In re Pfeifle)*, 154 F. App'x 432, 433 (5th Cir. 2003) (citing *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003)). "If this burden is met, the burden shifts to the debtors to show the inadequacy is justified under all of the

circumstances." *Id.* (citing *In re Dennis*, 330 F.3d at 703).   The Fifth Circuit has never "delineated a precise threshold beyond which a debtor becomes accountable for further recordkeeping." *Id*. at 435.   "A debtor's financial records need not contain 'full detail,' but 'there should be written evidence' of the debtor's financial condition." *In re Dennis*, 330 F.3d at 703 (quoting *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 201 (5th Cir. 1974)).   The bankruptcy court has "'wide discretion'" in both its initial determination of whether the debtor maintained adequate records and the subsequent question of whether any failure to do so was justified, and its decisions constitute "finding[s] of fact reviewed for clear error." *Id.* (quoting *In re Goff*, 495 F.2d at 200, 202).

Cadle does not argue that the Orsinis destroyed, mutilated, falsified, or concealed any financial records, maintaining only that they failed to keep sufficient documentation from which their financial condition could be ascertained.   Here, it is apparent that the Orsinis produced a substantial number of financial records.   Notably, they produced income tax returns, which are "the 'quintessential documents' in a personal bankruptcy." *Id.* (quoting *Nisselson v. Wolfson (In re Wolfson)*, 152 B.R. 830, 833 (S.D.N.Y.)).   Moreover, the Orsinis provided numerous additional documents, including bank statements, credit card statements, copies of checks, and investment account reports.   When requested, the Orsinis obtained supplemental documents from third parties, although they were unable to comply with Cadle's blanket discovery request, which essentially extended to every document related to the Orsinis' finances over the five-year period preceding their bankruptcy filing.

Cadle cites to a hodgepodge of district court opinions focusing on the importance of credit card and bank statements.   Not only are these opinions no more than arguably persuasive, each

20

case is either readily distinguishable or otherwise inapplicable.  In *Neugebauer v. Senese (In re Senese)*, the debtor produced only a "nominal" number of documents, including a single statement for each of fifteen credit accounts, one item obtained from the Internal Revenue Service, one post-petition checking account statement, and a copy of the title for a motorcycle.  245 B.R. 565, 570, 576 (Bankr. N.D. Ill. 2000).  In *The Cadle Company v. Terrell*, the debtor failed to produce *any* credit card or bank statements, and an expert witness testified that the available records were insufficient to understand the debtor's financial condition in the years preceding the bankruptcy. No. 4:01-CV-0399, 2002 WL 22075, at *4-5 (N.D. Tex. Jan. 7, 2002), *aff'd*, 46 F. App'x 731 (Table), 2002 WL 1973217 (5th Cir. July 30, 2002).  The Orsinis have clearly produced substantially more elucidating documents than the debtors in those cases.

In the remaining opinions cited by Cadle, the courts concluded that, under the circumstances of each case, the partial records supplied by the debtors were insufficient.  *See Vetri v. Meadowbrook Mall Co.*, 174 B.R. 143, 146 (M.D. Fla. 1994); *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 118 (Bankr. E.D.N.Y. 1993); *Exner v. Schultz (In re Schultz)*, 71 B.R. 711, 717 (Bankr. E.D. Pa. 1987).  Cadle has shown only that, in some cases, debtors have been denied discharge despite producing certain of the documents supplied by the Orsinis—it has fallen well short of demonstrating a global rule that production of incomplete credit card and bank statements, cancelled checks, and deposit slips mandates a denial of discharge.  In response, the Orsinis cite to several decisions holding that adequate records were produced under somewhat similar circumstances.  *See Urological Group, Ltd. v. Petersen (In re Petersen)*, 296 B.R. 766, 790 (Bankr. C.D. Ill. 2003); *The Fahey Banking Co. v. Irey (In re Irey)*, 172 B.R. 23, 24-26

21

(Bankr. N.D. Ohio 1994); *Ledbetter v. Zaidan (In re Zaidan)*, 86 B.R. 296, 298 (Bankr. S.D. Fla. 1988); *First Fla. Bank, N.A. v. Rowe (In re Rowe)*, 81 B.R. 653, 657 (Bankr. M.D. Fla. 1987).

Here, Judge Rhoades determined that the numerous statements and other documents produced by the Orsinis aggregate to form an adequate picture of the Orsinis' financial position prior to their bankruptcy.  She also found that "[t]here were no transactions, dispositions, sales, conveyances, or transfers which should have been documented or which could have provided creditors additional evidence of the Orsinis' financial picture."  Cadle has given the court no reason to deem these factual holdings clearly erroneous.  This court's ability to scrutinize the situation is complicated by the fact that many of the financial documents supplied by the Orsinis to Cadle are not part of the record; rather, these documents are merely mentioned on a list created by one of Cadle's employees.  As Cadle bears the burden of proof, the absence of these documents undermines its case.  Cadle arbitrarily points to existing gaps in the available records, but it does not explain how these lapses render the Orsinis' documentation inadequate.  Cadle's position, extended to its logical conclusion, would require debtors to produce continuous, exhaustive records without any gaps at all.  Such perfection is not required by the law.  *In re Dennis*, 330 F.3d at 703; *Neary v. Jordan (In re Jordan)*, No. 05-86647-HDH-7, 2006 WL 3420143, at *7 (Bankr. N.D. Tex. Nov. 21, 2006); *Johnson v. Greene (In re Greene)*, 340 B.R. 93, 98 (Bankr. M.D. Fla. 2006) (citing *Anderson v. Wiess (In re Wiess)*, 132 B.R. 588, 592 (Bankr. E.D. Ark. 1991) (citations omitted)); *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 898 (Bankr. N.D. Ill. 2003) (citing *Spiezio v. Vitek (In re Vitek)*, 271 B.R. 551, 558 (Bankr. S.D. Ohio 2001)).

Cadle also argues that the diminution in value of the Orsinis' retirement accounts was not documented adequately.  The record indicates that the Orsinis were invested in a nondiverse portfolio that was heavily reliant on technology stocks.  Although a few holes exist, the available records reveal an unfortunate, dramatic depreciation in the value of the Orsinis' holdings.  For example, on May 1, 2000, the value of Anthony's Rollover IRA Fidelity Investment Account was $190,880.91.  By May 31, 2000, the stocks had dropped in value to $137,209.58.  As of December 31, 2001, Anthony's account held the same number of shares in the same stocks, but the total value had plummeted to $33.495.00.  Although several of the subsequent records are difficult to decipher due to the poor quality of the copies, it appears that the holdings in this account remained unchanged through June 30, 2004, when they were collectively worth $37,794.43, revealing a precipitous drop from an initial purchase price of $208,418.44.  Similarly, the Orsinis' joint Fidelity Investment Account shows a decline in value from $107,769.74 to $61,408.26 between January 1, 2001, and December 31, 2001.  The Orsinis' Fidelity Ultra Service Account depicts a value of $11,567.24 as of December 31, 2001, representing a substantial diminution in value compared to the cost basis listed for the stocks.  Additional statements concerning other accounts likewise provide useful information about the Orsinis' financial picture during the relevant period.  While, as Cadle suggests, the Orsinis were poor investors, they nonetheless provided adequate records to document their failings.  *See Dennis*, 330 F.3d at 703.  Judge Rhoades's finding that the loss in value in the Orsinis' retirement accounts "was a result of natural market fluctuations, not due to transfers, distributions, liquidations, or dissipations of assets" is amply supported by the record and is not clearly erroneous.

23

Finally, Cadle reasons that because the Orsinis are relatively sophisticated individuals, they should be held to a higher standard of recordkeeping than the average debtor.  In its argument, Cadle somewhat overstates the Orsinis' financial expertise.  While Rebecca worked as a stockbroker for a period of time, her actual degree was in elementary education.  Although Anthony possessed a degree in finance, his work experience was technical and computer-related.  Furthermore, the Orsinis' financial limitations, as evidenced by the dismal outcome of their personal and business financial decisions, are apparent.  Thus, though the Orsinis might be somewhat more sophisticated than many debtors, Judge Rhoades was not obligated to impose an extraordinary standard of recordkeeping upon them.  *See generally D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 237 (2d Cir. 2006) (citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3d Cir. 1992)).

Likewise, Judge Rhoades's alternative holding that any failure by the Orsinis to maintain adequate records was justified under the facts and circumstances of the case is not clearly erroneous.  The bankruptcy court credited the Orsinis' testimony that credit card and bank statements were generally discarded after being reviewed, verified, and reconciled.  Nothing in the cold record leaves the court with a firm conviction that Judge Rhoades was mistaken in this assessment.  *See Tummel & Carroll v. Quinlan (In re Quinlivan)*, 434 F.3d 314, 318 (5th Cir. 2005) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)).

D.     Loss of Assets

Finally, Cadle argues that the bankruptcy court erred by concluding that the Orsinis were not subject to a denial of discharge under § 727(a)(5).  Judge Rhoades concluded that "there was

no loss of assets within the meaning of section 727(a)(5), and to the extent a loss could be said to have occurred, the Orsinis have satisfactorily explained the loss."

Section 727(a)(5) creates an exception to discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . ." 11 U.S.C. § 727(a)(5). "To establish a prima facie case, the creditor 'must prove which assets are "missing."'" *In re Kilroy*, 354 B.R. at 498 (quoting *Martin Marietta Materials Sw., Inc. v. Lee (In re Lee)*, 309 B.R. 468, 478 (Bankr. W.D. Tex. 2004) (citing *March v. Sanders (In re Sanders)*, 128 B.R. 963, 974 (Bankr. W.D. La. 1991))). "Once the creditor [establishes] a prima facie case, 'the burden then shifts to the debtors to provide a satisfactory explanation for that loss.'" *Id.* (quoting *In re Sanders*, 128 B.R. at 974); *see also First Tex. Sav. Assoc., Inc. v. Reed (In re Reed)*, 700 F.2d 986, 992-93 (5th Cir. 1983). "As long as the debtor's explanation is convincing and not rebutted, there is no need for documentary corroboration." *In re Cacioli*, 463 F.3d at 238 (citing *Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 97 (Bankr. E.D.N.Y. 1997)); *but see Powers v. Ottoson-King (In re Ottoson-King)*, 3 F. App'x 147, 151 (4th Cir. 2001) (holding that a debtor's failure to provide documentary evidence *may* justify the denial of discharge).   At the same time, vague and unconvincing explanations will not overcome the creditor's prima facie case. *In re Reed*, 700 F.2d at 992-93.  A debtor can violate § 727(a)(5) . . . yet still receive a discharge," provided the mistake is an honest one or the value of the asset is insubstantial. *In re Hudgens*, 149 F. App'x at 488 (citing *Prairie Prod. Credit Assoc. v. Suttles (In re Suttles)*, 819 F.2d 764, 766 (7th Cir. 1987)); *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 742 n.4 (Bankr. N.D. Ill. 2004) (citing *First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr. N.D.

25

Ill. 2002); *Farmers Nat'l Bank v. Kolbfleisch (In re Kolbfleisch)*, 97 B.R. 351, 356 (Bankr. N.D. Ohio 1989)).  "Whether a debtor has satisfactorily explained a loss of assets is a question of fact . . . [reviewed] for clear error."  *Id.* (citing *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996)); *see also The Cadle Company v. Andrews (In re Andrews)*, 98 F. App'x 290, 293 (5th Cir. 2004).

Specifically, Cadle points to the loss in value of the Orsinis' stamp and coin collections, jewelry, and home.  As Judges Rhoades pointed out, "the stamp and coin collections were not sold, transferred[,] or otherwise dissipated."  Rather, the Orsinis listed different values for these assets at different times.  This statement is equally true with regard the Orsinis' home.  Thus, it is not clear that there has been any "loss" or "deficiency" of these assets within the meaning of § 727(a)(5).  *See NAFCO Fed. Credit Union v. Lawson (In re Lawson)*, 308 B.R. 417, 427 (Bankr. D. Neb. 2004).  Other courts, however, have indicated that § 727(a)(5) is sufficiently broad to apply to situations in which assets have inexplicably lost value.  *See, e.g.*, *Wachovia Bank, N.A. v. Spitko (In re Spitko)*, ___ B.R. ___, 04-975, 2006 WL 3849956, at *45 (Bankr. E.D. Pa. Oct. 23, 2006); *Posillico v. Bratcher (In re Bratcher)*, 289 B.R. 205, 219-20 (Bankr. M.D. Fla. 2003) (citing *PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 116 (Bankr. W.D. Pa. 2000) (citing *Ernst v. Walton (In re Walton)*, 103 B.R. 151, 155 (Bankr. S.D. Ohio 1989))).

In any event, the bankruptcy court's ruling that the Orsinis offered credible, satisfactory explanations for the diminished value of these assets is not clearly erroneous.  Judge Rhoades determined that the original value accorded to the stamp and coin collections, as well as the jewelry, represented fair market value, but that the items were listed on the bankruptcy schedules at liquidation value.  Moreover, the bankruptcy court accepted Rebecca's explanation that her valuation of the stamp collection was based upon her plan to transform the stamps into art, as well

26

as her testimony that she lost a pair of earrings worth between $500.00 and $1,000.00.  Finally, Judge Rhoades observed that the Orsinis had very little time to assess the value of the stamps prior to the March 2000 statement.

Other courts have held that "'a difference in valuation methodology can be a satisfactory explanation for a diminution of assets when supported by evidence.'"  *In re Spitko*, 2006 WL 3849956, at *44 (finding that a debtor's explanation was satisfactory where he listed the replacement value of an item on his financial statement but the liquidation value of the asset on his bankruptcy schedule) (quoting *Kramer v. Poland (In re Poland)*, 222 B.R. 374, 382 (Bankr. M.D. Fla. 1998); citing *ITT Commercial Fin. Corp. v. Walz*, 115 B.R. 353, 356 (Bankr. N.D. Fla. 1990)); *see also Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 693 (Bankr. E.D. Pa. 2001).  The court is unwilling to reject the bankruptcy court's findings, premised upon its observations of the witnesses and the evidence at trial, based solely upon Cadle's skepticism about the precipitous reduction in the value of these assets.  *See In re Acosta*, 406 F.3d at 373-74.

Likewise, Judge Rhoades's conclusion that the Orsinis offered an adequate explanation for the reduction in value of their home is not clearly erroneous.  As explained above, the bankruptcy court credited the Orsinis' explanation that the home's value declined as a result of deferred maintenance, the opening of a dump site in the immediate vicinity, and the erection of seven billboards on an adjacent property.  Given these findings, the conclusion that the Orsinis' home might have suffered a substantial drop in value is not unreasonable.

III.   Conclusion

The United States bankruptcy judge did not commit reversible error in holding that the Orsinis' debts were subject to discharge.   Accordingly, the opinion of the United States Bankruptcy Court for the Eastern District of Texas in the above-styled matter is AFFIRMED.

SIGNED at Beaumont, Texas, this 29th day of March, 2007.

_Marcia A. Crone_
_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE